**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiffs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHARLES DAVIS, BART PANESSA, and JEFF NIEMEIER, Individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>KATANGA MINING LIMITED, JOHNNY BLIZZARD, JACQUES LUBBE, MATTHEW COLWILL, ARISTOTELIS MISTAKIDIS, LIAM GALLAGHER, TIM HENDERSON, IVAN GLASENBERG, and GLENCORE PLC,<br><br>      Defendants. | Case No. 2:17-cv-12188<br><br>**CORRECTED FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Charles Davis ("Lead Plaintiff"), and additional Plaintiffs Bart Panessa and Jeff Niemeier (together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, documents

1

filed and proceedings held before the Ontario Securities Commission ("OSC"), wire and press releases published by and regarding Katanga Mining Limited  ("Katanga" or the "Company"), and Glencore PLC ("Glencore") and its associated entities, analysts' reports and advisories about the Company and its parent Glencore, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Katanga on or through the U.S. OTC Markets from February 11, 2016 through November 7th, 2019, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Katanga is a partially-owned subsidiary of mining giant Glencore. Katanga operates a cobalt mine in the Democratic Republic of Congo ("DRC").  Unbeknownst to investors, beginning in or about 2008 and continuing through 2019, Defendants used a notorious "businessman" as an intermediary to pay bribes to the DRC president in exchange for mining concessions, Katanga's principal asset. Defendants concealed these illicit payments as legitimate transactions in Katanga's books and accounts. They touted the quality and profitability of these investments. And they never told investors the investments resulted from bribes rather than legitimate business practices – nor that Katanga would have to keep paying bribes if it wanted to keep the concessions. Katanga's stock price fell when it admitted that it may have engaged in

bribery. It fell again when the DRC government threatened to seize Katanga's DRC mines. And it fell yet again when to finance certain financial conditions imposed by the DRC, a Katanga recapitalization initiated by its parent diluted public investors' approximately 14% interest to a mere 0.4%, leaving their shares substantially worthless.

3.      Throughout the Class Period, Defendants touted Katanga's profitable operation and bright prospects to serve the growing cobalt market. Defendants also assured investors Katanga made every effort to comply with the law, a substantial concern given the location of its operations.

4.      Yet in truth, Katanga only controlled its sole asset because it had bribed DRC officials through Dan Gertler ("Gertler"), a notorious "businessman" who made his fortune from corruption.

5.      In and around 2009, when the Company was in a race with other offshore developers to secure the most lucrative mining rights in the DRC. Katanga won the race, forming a joint venture with the DRC's state-owned mining company, La Générale des Carrières et des Mines ("Gécamines"). Katanga owned 75%, and Gécamines  25%, of the Joint Venture.

6.       In fact, Katanga's majority owner —the international mining giant Glencore— had covertly secured the concession by extending approximately $64.5 million to Gertler-controlled entities, which Gertler then used to fund bribes to corrupt DRC officials, securing for Katanga one of the DRC's richest mining concessions for a fraction of the price Gécamines had initially demanded (and a fraction of the going rate for similar ore reserves at the time). Worse, Katanga was obliged to make continuous corrupt payments, in the form of royalties or *pas de porte*, the name for a form of transaction that is legal in the DRC but which in this case, unbeknownst to investors, were actually bribes made to Gertler. These bribes were diverted from Gécamines to a

Gertler-controlled entity—where they could fund further corrupt payments—in order to maintain access to its DRC mining operations.

7.      On July 31, 2017, Katanga disclosed that its independent were conducting an internal review of certain of Katanga's past financial accounting, and had concluded that "certain of the Company's historical financial statements and related management's discussion and analysis… will likely require restatement." On November 20, 2017, Katanga announced the resignation of three Glencore executives from Katanga's board of directors after an internal review found "material weaknesses" in the Company's financial reporting controls. As grounds, Katanga cited questions about the "appropriateness" of certain of Katanga's accounting practices that arose during an investigation by the Ontario Securities Commission (the "OSC"). The Company announced that *all* of its financial statements after its 2014 annual report should not be relied upon and would likely be restated. Katanga also admitted that the OSC was investigating Katanga's corporate governance practices and the adequacy of its risk disclosure with respect to "*international bribery, government payment and anti-corruption laws*." On this news, Katanga's stock price fell 24%.

8.      Even after restating its financial statements, Katanga continued to conceal the nature and scope of political and legal risk it faced in the DRC as a result of its alliance with Dan Gertler. In December 2017, United States authorities sanctioned Gertler, making it illegal for any U.S. entity to do business with him, noting that, "Gertler has used his close friendship with DRC President Joseph Kabila to act as a middleman for mining asset sales in the DRC… [a]s a result, between 2010 and 2012 alone, the DRC reportedly lost over $1.36 billion in revenues from the underpricing of mining assets…"

9.     Katanga and Glencore then stopped paying bribes through Gertler-controlled entities to avoid violating U.S. sanctions. Yet unbeknownst to investors, the nature of Katanga's relationship with Gertler was such that stopping the bribes would only cause the DRC government to shake down Katanga.

10.     The reprisals began when on April 22, 2018, Katanga announced that it was being sued by Gécamines to dissolve KCC. Gécamines alleged numerous financial improprieties by Katanga and Glencore. On this news, the price of Katanga's share fell 47%.

11.     Hot on the heels of that revelation, on April 27 2018, Katanga admitted that Kamoto was also being sued by an entity controlled by Gertler, Ventora Development Sasu ("Ventora"), which had served Kamoto with a freezing order in the amount of USD $2.28 billion. On news of the Gertler suit, Katanga's OTC share price fell another 24%.

12.     On June 12, 2018, Glencore announced that it had agreed to a settlement with Gécamines whereby KCC would waive its entitlement to replacement reserves and associated drilling costs incurred on Gécamines' behalf, amounting to $285 million and US$57 million respectively, and immediately pay  $150 million in cash. On June 15, 2018, Glencore announced that it would settle the Gertler dispute by resuming its payments to his affiliated entities, this time in euros instead of dollars, ostensibly in a bid to avoid violating U.S. sanctions. Then, on March 1, 2019, Glencore announced that it was "gifting" an additional US $1.4 billion to Gécamines. To date, Glencore has paid over US$1.8 billion to Gertler and corrupt DRC officials for Katanga to maintain control of its assets in the DRC. Thus, Glencore could only "solve" Katanga's disputes by agreeing to pay more bribes.

13.     On December 18, 2018, an OSC panel approved a settlement to resolve its investigation into Katanga's business practices. The Company agreed to pay penalties totaling

5

CAD $28.5 million, plus CAD $1.5 million in costs, and to retain an independent consultant approved by OSC Staff to conduct a review of Katanga's reporting procedures and internal controls.[1]

14.   Katanga admitted, among other things, that it had:

- "Failed to maintain adequate disclosure controls and procedures and internal controls over financial reporting"; and

- "Failed to disclose material risks to its business, and in particular, the heightened risk of public sector corruption in the DRC and the extent of Katanga's reliance on individuals and entities associated with Israeli businessman Dan Gertler… and the risk of an adverse impact of Katanga's business should its relationship with Gertler Associates deteriorate or cease."

15.   The OSC noted that Defendants Blizzard, Lubbe, Colwill, Mistakidis, Gallagher, and Henderson (together, the "Individual Defendants") each "authorized, permitted, or acquiesced in some of Katanga's breaches…" and  "admit[ted] that their conduct was also contrary to the public interest."[2] The Individual Defendants together paid a total of CAD $5.1 million in penalties.[3] Additionally, Defendants Mistakidis and Lubbe were prohibited from becoming or acting as a officers or directors of any Canada-listed company for four years, Henderson was

---

[1] Ontario Securities Commission, Settlement Agreement, In The Matter Of Katanga Mining Limited, *et al,*(the "OSC Settlement Agreement"), available at: http://www.osc.gov.on.ca/documents/en/Proceedings-SET/set_20181214_katanga-mining.pdf (last accessed: March 31, 2020).

[2] Ontario Securities Commission, Oral Reasons for Approval of Settlement: In the Matter of Katanga Mining Limited, *et al.* (the "OSC Approval"), available at: https://www.osc.gov.on.ca/en/Proceedings_oth_20181218_katanga-mining.htm (last accessedL March 31, 2020).

[3] See Ontario Securities Commission, Order In the Matter of Katanga Mining Limited,  *et al.* ("OSC Order"), available at: https://www.osc.gov.on.ca/en/Proceedings_rad_20181218_katanga-mining.htm (last accessed: March 31, 2020).  *See also* OSC Settlement Agreement.

6

banned for three years, Colwill and Blizzard for two years, and Gallagher for six years. Blizzard was required to resign as CEO of Katanga within 30 days''. As a direct result of the OSC probe, three of Katanga's directors resigned, including Defendant Mistakidis, a senior executive at Glencore PLC.

16.     In late 2019, Glencore moved to recoup some of its outlays from Katanga's shareholders. On November 7, 2019, Katanga announced it would commence a rights offering by which it would issues shares worth CAN $7.67 billion to "repay" U.S $5.8 billion in debt owed to an affiliate of Glencore PLC, effectively converting billions of dollars in debt to additional equity. The conversion effectively eliminated outside investors' stakes. Before the rights offering, Glencore held 86.3% of Katanga's outstanding shares. After the offering, Glencore holds approximately 99.6%. As beneficial holder of more than 90% of Katanga's shares, Glencore has the right to take Katanga private without obtaining approval of the remaining minority shareholders. On news of the rights offering, Katanga's shares plummeted by almost half their value on extraordinarily high volume, further damaging investors. Today, investors' shares in Katanga are nearly worthless, trading for pennies per share.

17.     By committing Katanga to ongoing corrupt payments to Gertler and Kabila, Defendants ensured it had no reasonable expectation of ever amounting to a legitimate business. By concealing the bribes, Defendants temporarily convinced investors that Katanga would have a future. But after Katanga's scheme unraveled and was disclosed, and Glencore recapitalized its interest, Katanga's stock price came to reflect what Katanga had been worth along – nothing.

**JURISDICTION AND VENUE**

18.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

20.     Defendants are subject to personal jurisdiction in the United States and in this District because, as alleged in further detail below: (i) they engaged in the fraudulent scheme and course of conduct described herein, including by engaging in fraud that arose from transactions and occurrences that took place in and caused foreseeable losses in the United States; (ii) in committing the fraudulent acts complained of herein, Defendants operated as a unitary business and an integrated enterprise with substantial offices and operations, including those based in the United States, and controlled the internal affairs and operations of those offices to the extent that they became mere instrumentalities of their parent; and  (iii) Defendants have had and continue to have continuous and systematic contacts with this forum that render them at home in the United States.

21.     Katanga is a majority-owned subsidiary of mining giant Glencore. Katangaoperates a cobalt mine in the Democratic Republic of Congo ("DRC"). Its shares are listed on the Toronto Stock Exchange ("TSX").[4] The Company's securities are traded in the United States on the OTC exchange under the ticker symbol "KATFF." A foreign share is established in the U.S. when a broker-dealer files with the Financial Industry Regulatory Authority ("FINRA") to create a U.S.

---

[4] Pursuant to listing requirements of the Toronto Stock Exchange, Katanga must file an Annual Information Form ("AIF"), which includes a discussion a risk factors and other material matters, and is incorporated by reference into Management's Discussion and Analysis accompanying each of Katanga's interim and annual financial reports during the Class Period.

8

ticker symbol in order to facilitate reporting trades in the U.S. in the company's security. OTC Markets Group, Inc., the operator of the OTC Market, identifies KATFF as "Ordinary Shares" on its website.

22.     In 2009, in connection with the listing of its stock on the U.S. OTC exchange, Katanga consented to personal service in the United States for any legal action in connection with such securities, and appointed a U.S. agent for service of process, Puglisi & Associates, located at 850 Library Avenue, Suite 204, Newark, Delaware 19711. [5]

23.     Venue is proper in this judicial district under §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of Defendants' actions and subsequent damages took place within this judicial district.

24.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

25.     Lead Plaintiff Charles Davis purchased Katanga securities at artificially-inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures set forth in the PSLRA certifications previously filed with the Court, which are hereby expressly incorporated by reference herein.

---

[5] Form F-X for Katanga Mining, Ltd., filed May 26, 2009, available at: https://www.otcmarkets.com/filing/html?id=6624919&guid=pYIWUaqrKG0qr3h (last accessed April 6, 2020).

26.     Named Plaintiffs Bart Panessa and Jeff Niemeier purchased Katanga securities at artificially inflated prices during the Class Period and were damaged upon the  revelation of the alleged corrective disclosures as set forth in their PSLRA certifications. Each of their certifications is filed herein and incorporated by reference.

27.     Substantially all of Katanga's business is extracting copper and cobalt ore, with principal operations at the Kamoto Mine, located near Kolwezi in the Katanga Province of the Democratic Republic of Congo ("DRC").

28.     Defendant Johnny Blizzard ("Blizzard") was the CEO and a director of Katanga. Blizzard first joined Katanga as its COO in January 2015 and became its CEO on February 12, 2015. He left his position as CEO of Katanga in or around January 2019 as required by the Ontario Securities Commission ("OSC") settlement agreement to settle civil and criminal claims that he had made false statements, among other things.

29.     Defendant Matthew Colwill ("Colwill") was the CFO of Katanga from February 2015 to October 2016. Between October 2011 and November 2013, Colwill was a Finance Manager at KCC.

30.     Defendant Jacques Lubbe ("Lubbe") was the Chief Financial Officer ("CFO") of Katanga from November 2013 to February 2015, and from October 2016 to November 2017.

31.     Defendant Aristotelis Mistakidis ("Mistakidis") was a Glencore-nominated director of Katanga during the Class Period. Mistakidis is also a member of Glencore's senior management. From 2008 to 2013, Mistakidis was a co-head of Glencore's global copper and zinc department, and from 2013 to November 2017, he headed Glencore's global copper department. Glencore's 2017 Annual Report identified Mistakidis as having the third-highest shareholding of all Glencore

management personnel, owning 3.12% of Glencore's voting shares. Gallagher and Henderson reported to Mistakidis.

32.     Defendant Liam Gallagher ("Gallagher") was a Glencore-nominated director of Katanga during the Class Period. From 2009 to November 2017, Gallagher was an employee of Glencore and held the position of Asset Manager for Katanga. From 2013 and onward, Katanga was the only asset that Gallagher managed for Glencore. In the Asset Manager role, Gallagher managed Katanga as a financial asset of Glencore. His responsibilities as Asset Manager included, in particular, reviewing periodic financial results. Gallagher was a member of Katanga's audit committee (the "Audit Committee") from November 2012 to November 2017.

33.     Defendant Tim Henderson ("Henderson") was a Glencore-nominated director of Katanga during the Class Period. Henderson's tenure as a Glencore-nominated director of Katanga spanned from May 2015 to November 2017. From 2008 to 2014, Henderson served as an operations consultant to Glencore under  a consulting agreement with the company. In this role, Henderson held the title of Glencore's executive director of operations for Africa and divided his time overseeing Glencore's various copper mining operations in Africa, including Katanga. In January 2015, Henderson's responsibilities expanded to include Glencore's copper mining operations in South America and Australia.

34.     Defendant Ivan Glasenberg ("Glasenberg") has served as Glencore's Chief Executive Officer ("CEO") since 2002. Glasenberg was personally and directly involved in negotiating corrupt transactions in the DRC. Further, according to an article published near the

end of the Class Period, Glasenberg "personally managed Glencore's relationship with Gertler," citing "six executives involved in the transactions…".[6]

35.     Defendant Glencore is the principal shareholder and controlling parent of Katanga. Glencore produces, refines, processes, stores, transports, and markets metals and minerals, energy products, and agricultural products worldwide. Throughout the Class Period Glencore maintained a substantial presence in the United States, and currently has offices, operations, or subsidiaries located in Alabama, Arizona, California, Connecticut, Delaware, Georgia, Illinois, Kentucky, Louisiana, Maryland, Michigan, New York, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, and Washington.

36.      Glencore, through Katanga and other subsidiaries it owns and controls, operates mines in the DRC. Between January 2012 and February 2017, Glencore owned approximately 75% of Katanga's shares. It acquired an additional interest by converting $5.8 billion of its debt to shares in November 2019. Glencore today owns more than 99% of Katanga's outstanding shares.

37.     Defendants Blizzard, Lubbe, Colwill, Mistakidis, Gallagher, and Henderson are sometimes referred to collectively herein as the "Individual Defendants."

38.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

---

[6] *Trouble in the Congo: The Misadventures of Glencore,* Bloomberg Businessweek, November 16, 2018, available at: https://www.bloomberg.com/news/features/2018-11-16/glencore-s-misadventure-in-the-congo-threatens-its-cobalt-dreams (last accessed March 24, 2020)

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

39.     Katanga is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

40.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

41.     Glencore is liable for the acts of Katanga and its agents, officers, directors, and employees as it exercised dominion and control over Katanga and the Individual Defendants, appointing Defendants Mistakidis, Gallagher, and Henderson to Katanga's Board of Directors and directing their actions in managing Katanga.

42.     Glencore is also liable for the acts of its agents, officers, directors, and employees as it exercised control over Katanga and the Individual Defendants, appointing Defendants Mistakidis, Gallagher, and Henderson to Katanga's Board of Directors and directing their actions in managing Katanga.

43.     Glencore's domination and control of Katanga was so complete and total that Glencore's officers and employees responsible for Katanga's business acted with complete authority on its behalf in negotiating and approving transactions and corporate actions, including the alleged corrupt dealings that form the basis of Plaintiffs' claims herein. Glencore and its personnel acted as agents for Katanga and negotiated with Gécamines and DRC officials on Katanga's behalf. Glencore and its personnel acted as agents for Katanga in negotiating and funding corrupt payments to and through Gertler and DRC officials to secure concessions for Katanga. Glencore and its personnel funded corrupt payments through financial instruments and loans issued by and in the name of Glencore-controlled and affiliated entities and structured those transactions to conceal their true nature from investors and the public.

44.     The Individual Defendants, because of their positions with Katanga and Glencore, possessed the power and authority to control the contents of Katanga's public statements, reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Katanga's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to—and were being concealed from—the  public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

45.     Katanga, Glencore, and the Individual Defendants are referred to herein, collectively, as the "Defendants."

14

## RELEVANT NON-PARTIES

46.     **Dan Gertler** is an international "businessman" and billionaire who has amassed his fortune through corrupt mining deals in the DRC. On December 21, 2017, the U.S. Government designated Gertler and his affiliated companies as Specially-Designated Nationals ("SDNs"), imposing sanctions that block them and companies they control from holding assets or conducting transactions in the United States. Despite this, Glencore continues to make royalty payments to Gertler to this day.

47.     **Och-Ziff Capital Management Group Inc.**  ("Och-Ziff") is is a corporation organized under the laws of the state of Delaware, with its principal executive offices located at 9 West 57th Street, New York, New York, 10019. It was one of the largest hedge funds in the world, and was listed on the New York Stock Exchange ("NYSE") under the ticker symbol OZM on November 14, 2007. It was the subject of a lengthy investigation by the U.S. Securities Exchange Commission ("SEC") and U.S. Department of Justice ("DOJ") related to violations of the Securities Exchange Act of 1934 ("Exchange Act") and the  Foreign Corrupt Practices Act of 1977 ("FCPA"), with respect to which it entered into a Deferred Prosecution Agreement (the "Och-Ziff DPA") on September 29, 2016, under which it admitted responsibility for a number of violations of law and regulations and stipulated to joint Statement of Facts (the "Och-Ziff DPA SOF"). It changed its name on September 12, 2019 to Sculptor Capital Management, Inc. and now trades under the ticker symbol SCU.

48.     **Joseph Kabila** ("Kabila") is the son of warlord and former DRC President Laurent-Désiré Kabila. Kabila became president of the DRC after his father's assassination in 2001. A 2001 United Nations investigation found that Kabila received from Dan Gertler approximately $20 million to buy weapons to equip his army against rebel groups in exchange for a monopoly on the

country's diamonds.[7] The Och-Ziff DPA identifies "DRC Official 1" as a senior official in the DRC who "had the ability to take official action and exert influence over mining matters in the DRC." *Id.* The DPA describes Gertler as having a close relationship with "DRC Official 1" and describes Gertler as using "his significant political influence with DRC Official 1…and his clique to frustrate competitors." *Id.* at 25. DRC Official 1 is widely understood to be Kabila.

49.   **Katumba Mwanke** ("Mwanke") was the governor of Katanga under Laurent-Désiré Kabila, and a senior figure in Joseph Kabila's inner circle. A Financial Times article described Mwanke as part of the "entrenched corruption" in the DRC. He had a history of dealings with Gertler's father and introduced Gertler to Kabila. Mwanke died in a plane crash in on February 12, 2012. Joseph Kabila and Dan Gertler are photographed together attending Mwanke's funeral.

50.   **Gécamines**. La Générale des Carrières et des Mines ("Gécamines") is a DRC state-owned mining agency which holds a residual 25% stake in Katanga's DRC operating subsidiary, Kamoto Copper Company, through a joint-venture agreement with Katanga (the "JV Agreement"). Nearly two-thirds of the U.S. $1.1 billion Gécamines was contractually entitled to between 2011 and 2014 cannot be reliably tracked.

51.   **The Kamoto Copper Company S.A.**. ("KCC") is a DRC-based corporation and Katanga's principal operating subsidiary in the DRC. Through a Joint-Venture Agreement ("JV Agreement") Katanga holds a 75% stake and Gécamines retains the remaining 25%. The JV

---

[7] U.N. Security Council, *Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of DR Congo* (the "2001 U.N. Report"), published April 12, 2001, available at:
https://repositories.lib.utexas.edu/bitstream/handle/2152/5170/2477.pdf?sequence=1 (last accessed March 24, 2020).

Agreement provides for profit-sharing and so-called *pas de porte*[8] payments from Katanga/KCC to Gécamines. These payments were, at various times, redirected to Gertler-controlled entities where they were used to fund corrupt payments to Congolese officials.

52.     **Fleurette Holdings Netherlands B.V.** (together with affiliated entities, including Fleurette Properties Limited, "Fleurette Group" or "Fleurette") is a private company headquartered in Amsterdam and controlled entity of Dan Gertler. Fleurette has conveyed large sums of money to Gécamines and pliable DRC officials through loans and suspect business transactions.

53.     **Lora Enterprises Limited** ("Lora") is a Virgin Islands-based corporation controlled by Gertler through his family's trust. The U.S. Department of Justice has disclosed in international court filings that it has evidence that shows bribes paid by Glencore through Lora Enterprises to high-level DRC officials in exchange for mining rights and government benefits.

## DEFENDANTS' MISCONDUCT

### a.   Katanga Channels Bribes to DRC Officials Through Gertler

54.     In 2004, Katanga entered into a joint-venture agreement (the "Kamoto JVA") with Gécamines, the DRC's state-owned mining company. Pursuant to that agreement, Katanga and Gécamines formed an operating subsidiary, the Kamoto Copper Company ("KCC"), in which Katanga holds a 75% stake and Gécamines holds the remaining 25%.

55.     By early 2008, the DRC government was conducting a "review" of its various contracts and business relationships with foreign developers, including Katanga and Glencore. Despite the political overtones of the government's review, Katanga's chief executive told board

---

[8] In the DRC mining sector, *pas de porte* is a term of art that denotes an upfront payment of nonrefundable tax—cash paid in advance to secure access to the DRC's lucrative mining opportunities. The term in French means (informally) "key money": a bribe offered under-the-table as inducement to transfer a lease.

members in February 2008, the country was unlikely to want a bigger stake under an existing joint venture agreement.[9]

56.    Months later, however, Gécamines began pressuring Katanga for changes, citing worker safety and human rights concerns. The Katanga board agreed at a June 2008 meeting that Gécamines' demands were "quite unacceptable.[10] Katanga's board elected to bring in a third-party to help smooth things over. "Dan Gertler, who had a substantial indirect interest in the Company, should be given a mandate from the Board to negotiate with the DRC authorities…" Gertler at the time held a significant minority stake in Katanga through an offshore trust. Among the Katanga board members was Glencore shareholder and director Mistakidis.

57.    Gertler obtained results almost immediately. Katanga's then-CEO told its board of directors in a call a mere month later that "Gertler had fulfilled his mandate very well." Katanga inked a new memorandum of understanding that called for $10 million in additional future royalties to be paid the government.

58.    In October 2008, Gécamines returned with more demands, including "additional monies" totaling $585 million for a signing bonus. To resolve this "vitally important matter," the board decided that four Katanga directors, including Isaacs and Mistakidis, would speak with Gertler again.

---

[9] ICIJ, *Room Full of Secrets Reveals Glencore's Mysteries*, November 5, 2017, available at: https://www.icij.org/investigations/paradise-papers/room-of-secrets-reveals-mysteries-of-glencore/, last accessed March 24, 2020).

[10] *Id.*

59.     While negotiations with Gécamines were underway, Katanga was facing competition from other developers eager to tap into the DRC's purportedly vast mineral reserves and needed additional capital to remain competitive.

60.     Katanga obtained the cash it needed with a January 2009 $265 million loan from Glencore.[11] The loan was convertible into Katanga stock at market rates. In June of 2009, after Katanga's stock price collapsed, Glencore converted the loan. From that point forward, Glencore held a controlling majority of Katanga's stock.[12] Glencore's financial statements reflect Katanga's financial results as a consolidated subsidiary.

61.     Glencore held three of the five seats on Katanga's Board of Directors. Glencore's nominees, Defendants Mistakidis, Gallagher, and Henderson, were appointed to Katanga's Board during the Class Period, until all three were forced to resign in the wake of the OSC's investigation.

62.     Through a complicated loan-back arrangement, Glencore "lent" $64.5 million to a Gertler-controlled entity, which transferred the cash to another Gertler-controlled entity owned by a trust whose beneficiaries are Gertler's family. That latter entity then transferred $16.0 million to a Glencore affiliate in exchange for a call option to purchase stock of Katanga issued to yet another Gertler-controlled entity. All told, Gertler received "loans" of $48.5 million as well as valuable call options, to corruptly facilitate Katanga's obtaining the concession for the Kamoto mine. The term sheet for the loan gave Glencore the right to repayment of the loan if the joint venture Gertler was helping to negotiate with the DRC wasn't finalized in the following months.

---

[11] Part of this loan was directed to Gertler-controlled entities as part of a scheme to launder money paid to and through Gertler for bribes, as will be described in greater depth in the subsequent section.

[12] As of July 2009, Glencore held approximately 77.9% of Katanga's outstanding shares.

63. The terms of the loan have not been disclosed, but based on contemporaneous disclosures in 2010, Lora's repayment of this loan was covered by still more loans from Glencore and buybacks of stock issued to Gertler at discounted option prices.

64. In March 2009, two months after agreeing to the term sheet, Katanga's CEO announced at a board meeting that he had met Gertler. The meeting's minutes noted that "As a result . . . revised proposals were made by Katanga which has resulted in the resolution of most issues" with DRC authorities.

65. Not only was the deal going forward, but Gertler had "persuaded" the DRC to accept a signing bonus worth $140 million instead of the more than $580 million it had previously demanded, and one-quarter of what any other mining company would have paid, on average, per ton of copper at the time.

66. In fact, Katanga only obtained this discount because it had agreed to bribe Kabila and other Congolese officials.

67. In February 2010, Glencore sold Gertler 157 million shares in Katanga for $52 million, or approximately $0.33 per share. The strike price was the lowest closing price the stock had *ever* reached. Gertler sold Glencore back 100 million of these shares the next month for $76 million. The 57 million shares Gertler retained were worth about $43 million, leaving him with a profit of $67 million (or approximately 128%) on the transaction.

68. These transactions remained a secret until late 2018.[13]

---

[13] *Trouble in the Congo: The Misadventures of Glencore,* Bloomberg Businessweek, November 16, 2018, available at: https://www.bloomberg.com/news/features/2018-11-16/glencore-s-misadventure-in-the-congo-threatens-its-cobalt-dreams (last accesses March 24, 2020).

69.     In sum, to secure the Katanga concession, Glencore lent Gertler $64.5 million and a call option on favorable terms. Exercising the option secured Gertler a $67 million profit. The transaction was only the first of many through which Glencore would pay Gertler to funnel bribes to Congolese officials.

70.     Defendants continued to pay Gertler to maintain relations with the DRC government. Between October 2010 and December 2013, a Gertler associate (Peter Deboutte) was charged with maintaining Katanga's relationship with DRC officials. Deboutte and his associates represented Katanga on a series of matters involving the DRC government.

71.     Katanga did not disclose that it had relied on or continued to rely on Gertler or his associates, including Deboutte.

72.     From 2010 through early 2015, Gécamines directed that royalties and *pas de porte* owed to Gécamines related to its residual share of KCC under JV Agreement be paid to Africa Horizons Investment Ltd. ("AHIL"), a Gertler-controlled entity. Katanga made the payments to AHIL in December 2013. The payments in 2014 alone amounted to $30 million.

73.     In its 2013 and 2014 Annual Information Forms, Katanga misleadingly claimed that the royalties and *pas de porte* were paid to Gécamines, rather than AHIL

74.     In January 2015, KCC amended the JV Agreement to formally assign Gécamines's right to receive royalties to AHIL (the "Tripartite Royalty Agreement"). In March and July 2015, Katanga paid further royalty and *pas de porte* prepayments to AHIL. These payments amounted to over USD $83 million.

75.     Katanga disclosed in its 2015 AIF that royalties and *pas de porte* were required to be paid under the JV Agreement, without identifying the payee. Katanga did not disclose: (i) the

amendment of the JV Agreement; (ii) the Tripartite Royalty Agreement; or (iii) that it had previously paid royalties and *pas de porte* to AHIL.

76.     During that period, Katanga paid AHIL more than USD $146 million. Katanga misleadingly disclosed in its 2016 Annual Information Form that KCC was required to pay royalties to a "third party", when in truth the "third party" was the notorious corrupt businessman Gertler.

> **b. The U.S. Investigates Och-Ziff's Relationship with Gertler and his Associates, and Glencore and Katanga Public Move to Distance Themselves While Secretly Continuing Corrupt Payments**

77.     In September 2016, Och-Ziff Capital Management Group paid over $413 million to resolve civil and criminal liabilities resulting from using Gertler to funnel bribes to Kabila to secure business in the DRC.

78.     To minimize its exposure to potential investigations and negative attention from the law enforcement agencies, regulators, the press, and watchdog groups, Katanga and Glencore promptly began to negotiate with Gertler to buy out his stake in Katanga and other Glencore DRC businesses. They reached an agreement in February of 2017, when the parties agreed to settle all outstanding debts and for Glencore to pay $534 million in cash to Gertler to buy out his interest in Glencore-affiliated entities, including his 10.3% holding in Katanga. The total value of the cash and net settled debts to Gertler was $960 million.

79.     Contemporaneous press coverage conveyed the same message:

"The deal allows Glencore to end a relationship that has brought much scrutiny, both for corruption investigations into Gertler and for the close nature in which the companies developed their business… Ending ties with Gertler may protect Glencore from political uncertainty in Congo if the billionaire's friend Joseph Kabila leaves power… It also puts some distance between Glencore and Gertler,

four months after the company said it was reviewing bribery allegations said to implicate the billionaire." [14]

80.     In truth, Katanga—through Glencore, acting on its behalf and for its benefit—continued to make regular payments through KCC to Gertler and his associated entities in the form of royalties

81.     Katanga, through its subsidiary KCC, continued to make regular payments to Gertler-related Africa Horizons Investments Limited ("AHIL") related to mining rights acquired from Gécamines   for KCC. These continued payments to Gertler-related AHIL would not be disclosed until April of 2018, as discussed further herein.

### c.   The Ontario Securities Commission Investigates Katanga

82.     On July 27, 2017, the Wall Street Journal reported that the OSC was investigating Glencore. The Wall Street Journal revealed that the investigation centered on previously-undisclosed misconduct, namely the over $100 million in payments made by Katanga Mining to Gertler instead of Gécamines:

> LONDON— Glencore PLC is subject to a Canadian investigation of more than $100 million in payments a subsidiary made to a company owned by an Israeli businessman who has been accused of bribing Democratic Republic of the Congo officials, said people familiar with the probe.
>
> The investigation by securities regulators stems from payments that a Canada-based copper-mining company controlled by Glencore and that operates in Congo was expected to make to Congo's state-run mining company, Gécamines, but instead sent to a Caymans Island company owned by the Israeli businessman, Dan Gertler. Glencore has acknowledged the shift in payments and said it was done at the request of Gécamines.
>
> Canada's Ontario Securities Commission, the country's biggest regional securities regulator, is investigating whether the Glencore subsidiary, Katanga Mining, violated rules requiring that companies disclose business done with their own

---

[14] *Id.*

investors, said the people familiar with the investigation. Katanga is listed in Toronto and Mr. Gertler's company has invested in its business.

\*       \*       \*

Under a deal with the Congolese government, Gécamines is allocated a slice of annual sales from Katanga Mining subsidiary Kamoto Copper Co., known as KCC. But rather than send the royalties to Gécamines, KCC has been sending them to Mr. Gertler's Cayman Islands-based company, Africa Horizons Investment Ltd., Glencore and Fleurette have said.

Glencore and Fleurette have said Gécamines wanted the money shifted to Mr. Gertler's company to pay back a $196 million loan Fleurette made to Gécamines in 2013. The payments are ongoing, they said.

\*       \*       \*

The probe represents a new risk posed by Glencore's longtime relationship with Mr. Gertler, from whom the company has sought to distance itself in recent months.[15]

83.     On this news, the price of Katanga's shares fell from a July 27 close of $0.63 to

close at $0.59 on July 28, down 6%.

### d. Katanga is Forced to Disclose the OSC Investigation and Issue Restatements

84.     On July 31, 2017, before close of trading, Katanga announced that its independent

directors were reviewing certain of Katanga's past financial statements. Katanga further

announced that in the course of their review, the directors had concluded that "certain of the

Company's historical financial statements and related management's discussion and analysis…

will likely require restatement." Katanga also admitted to investors that "OSC enforcement staff

are also investigating the adequacy of Katanga's corporate governance practices and compliance

with those practices and the related conduct of certain directors and officers of Katanga" and

---

[15] *Glencore Under Probe Over Congo Payments,* The Wall Street Journal, July 27, 2017, available at: https://www.wsj.com/articles/glencore-under-probe-over-congo-payments-1501184279 (last accessed March 24, 2020).

"Katanga's risk disclosure in connection with applicable requirements under certain international bribery, government payment and anti-corruption laws."

85.     On this news, the price of Katanga's stock fell from a July 28 closing price of $0.55 to close at $0.42 on July 31, the next trading day, a 23.6% decline.

86.     On November 20, 2017, Katanga issued a Press Release making several announcements. First, Kantaga announced that three executives of Glencore had resigned from Katanga's board of directors after an internal review found "material weaknesses" in the Company's financial reporting controls. Katanga stated that questions about the "appropriateness" of certain of Katanga's accounting practices arose in an investigation by the Ontario Securities Commission (the "OSC"). Second, Katanga announced that it was restating its financial statements for the years 2015 and 2016, as well as the first quarter of 2017, and advised investors that "the Company's previously filed consolidated financial statements for the years ended December 31, 2016, 2015 and 2014 and related MD&A [management's discussion and analysis] and all interim consolidated financial statements and interim MD&A since December 31, 2014 should not be relied upon.": Third, it announced that contrary to its earlier statements , its internal controls over financial reporting were materially ineffective:

**BACKGROUND OF THE REVIEW**

Following the end of the second quarter of fiscal 2017, in the course of the OSC Investigation, information drawing into question the appropriateness of certain of the Company's accounting practices came to the attention of the independent directors of the Company. This information led the Board of Directors (the "Board") of the Company to request the independent directors of the Board, being Robert G. Wardell, Terry Robinson and Hugh Stoyell (the "Independent Directors"), to conduct a review of these practices. At the direction of the Independent Directors, an internal review (the "Review") was undertaken. The Independent Directors engaged Canadian legal counsel, and a multinational accounting firm, to assist the Independent Directors in conducting the Review. The Review identified accounting practices that, among other things, incorrectly

recorded the total tonnage of finished copper cathode production which resulted in an overstatement of finished product inventories and incorrectly recorded the valuation of copper concentrate included in work in progress inventories, the valuation of ore in stockpile inventories and the amounts of property, plant and equipment during 2016, 2015 and prior periods, which practices were not appropriate and required adjustment.

*       *       *

**INTERNAL CONTROLS OVER FINANCIAL REPORTING**

The Review concluded that the accounting practices that resulted in the restatements described above demonstrated the following material weaknesses in the Company's internal control over financial reporting ("ICFR"):

- Control environment material weaknesses – The control environment is the responsibility of senior management, sets the tone of the organization, influences the control consciousness of its employees, and is the foundation of the other components of ICFR. The Company has concluded that it did not adequately establish and enforce a strong culture of compliance and controls which includes the adherence to policies, procedures and controls necessary to present financial statements in accordance with IFRS.
- Management override material weakness – The Company did not maintain effective controls to prevent or detect the circumvention or override of controls. Certain of the accounting adjustments identified in the Review are a result of senior management and executive directors in office at that time overriding the Company's control processes.
- Monitoring material weaknesses – Monitoring ensures that the entire system of internal control is monitored continuously and problems are addressed timely. The Company has determined that certain of the accounting adjustments identified in the Review were not identified earlier due to inadequate monitoring controls, including inadequate controls and procedures to properly quantify and verify the value of in-process concentrate inventories, inadequate controls with respect to quarter-end and year-end sales cut-off procedures, insufficient involvement of internal audit in the testing of the accuracy of external financial reporting and inadequate procedures to ensure the effective implementation of internal audit recommendations on high risk areas, particularly with respect to metal accounting.

87.     Fourth, Katanga revealed that it and certain of its key personnel had knowingly

failed to disclose and/or sought to avoid disclosure of the Company's business dealings with Dan

Gertler and his affiliated entities, and through them, with Joseph Kabila, and the substantial risks posed to Katanga's business in the DRC should those relationships deteriorate or cease.

88.    On this news, the price of Katanga's shares fell from a closing price on November 20 of $0.97 to close at $0.83 on November 21, down 14.4%.

### e.  The U.S Imposes Sanctions Blocking U.S. Citizens and Businesses from Doing Business with Gertler

89.    On December 21, 2017, the U.S. issued an executive order targeting human rights abuses and corruption that, among other things identified certain actors as Specially Designated Nationals (SDNs). The designation imposed blocking sanctions on them and any companies in which they directly or indirectly owned a controlling stake. Gertler and his associated companies, including AHIL, were among those so designated.[16]

90.    As a result of the sanctions, KCC stopped paying bribes to Gertler to avoid violating the U.S. prohibition upon engaging in transactions with blocked persons.

91.    Yet unbeknownst to investors, Katanga had not just paid bribes through Gertler **to obtain** the concession. Rather, Katanga was obligated **to keep paying** bribes to Gertler to avoid losing its DRC operations. By ceasing payments to Gertler, Katanga exposed itself to risk of reprisals which placed its DRC operations in jeopardy.

### f.  Gécamines Sues in DRC Courts to Dissolve KCC

92.    On April 22, 2018, Katanga published a press release on its website that disclosed that two days earlier, citing as a pretext KCC's purported failure to meet minimum capitalization requirements, Gécamines had commenced legal proceedings in the DRC to dissolve KCC.

---

[16] Press Release, U.S. Department of the Treasury, *United States Sanctions Human Rights Abusers and Corrupt Actors Across the Globe,* December 21, 2017, available at: https://home.treasury.gov/news/press-releases/sm0243 (last accessed March 24, 2020).

93.     As a result, Katanga's stock price fell from $1.40 on April 20 to close at $0.74 on April 23, the next trading day, down 47%.

94.     Then, after close of trading on April 24, 2018, a Gécamines spokesman was quoted as saying that Katanga and Glencore had forced local companies to pay interest rates of 14%. The spokesman was also quoted as saying, ominously, that  "It appears that [] through a series of intra-group financial and commercial agreements, the majority shareholders group [i.e, Katanga] implemented a policy that resulted in draining, to its own benefit, the treasury and wealth of the joint company."

95.     The next trading day, the price of Katanga's shares fell another 17% from their previous-day close, from $0.88 to $0.73.

### g.  Gertler's Company Sues to Freeze Katanga's Assets in the DRC

96.     Days later, Katanga's troubles mounted again. On April 27, Katanga admitted that Gertler had caused one of his entities to sue KCC in DRC court and had served KCC, KCC with an order freezing $2.28 billion of its cash, claiming that Katanga was contractually obliged to keep making payments to that entity. On this news the price of Katanga's shares fell from a previous-day closing price of $0.72 to close at $0.55 on April 27, 2018, down 23.6%.

### h.  Katanga and Glencore Settle Litigation with Gécamines and Gertler By Agreeing to Pay More Bribes

97.     On June 12, 2018, Katanga announced that it had agreed to a settlement with Gécamines to resolve the claims against KCC. Though purporting to outline the "key terms of the Settlement Agreement", Katanga's press release announcement omitted one term: that Katanga and/or Glencore would be gifting $1.4 billion to Gécamines.

98.     Accordingly, this press release mispresented Katanga's involvement in bribery that would subject Katanga to heightened scrutiny by U.S. and foreign government bodies resulting in investigations into Katanga's compliance with money laundering and bribery laws.

99.     On June 15, 2018, Katanga published a press release on its website confirming what the market had surmised from the April 2018 lawsuits against KCC: that Katanga must keep paying bribes to Gertler and Kabila or lose its concession.

100.    The release stated, in relevant part:

> …Katanga, in conjunction with Glencore, has carefully considered its various legal and commercial options in connection with its dispute with Ventora and its obligations towards Africa Horizons Investments Limited ("AHIL"), a company also affiliated with Mr. Dan Gertler, as well as to its shareholders, customers and other shared stakeholders including the communities in which they operate in the Democratic Republic of the Congo ("DRC").*Based on its review, Katanga has determined that in the circumstances the only viable option, for its sole operation, KCC, to avoid the material risk of seizure of its assets under DRC court orders is for KCC to pay the relevant royalties as and when they become due to Ventora in non-US dollars, without involving US persons, in order to discharge its obligations under the terms of the pre-existing contracts with AHIL previously disclosed by Katanga.* KCC has therefore entered into a settlement deed with AHIL and Ventora pursuant to which the parties have agreed to withdraw all pending and threatened litigation between them.

Emphasis added.

101.    The same day Bloomberg published an article[17] stating in pertinent part:

> Not many billion-dollar companies would be willing to circumvent U.S. sanctions for their business partner, but then few people are as powerful as Dan Gertler in the Democratic Republic of Congo.
>
> * * *
>
> "Glencore seems more afraid of Gertler's striking power in Congo's courts than of U.S. sanction," said Elisabeth Caesens, a Congo expert and director of Brussels-

---

[17] *The Israeli Billionaire Forcing Glencore to Buck U.S*. Sanctions, Bloomberg, June 15, 2018, available at: https://www.bloomberg.com/news/articles/2018-06-15/gertler-flexes-his-power-as-glencore-bows-to-congo-pressure (last accessed April 6, 2020).

based Resource Matters. "Time will tell if this is the right bet, it's arguably not the most ethical one."

* * *

In April, Gertler won a Congo court ruling to seize almost $3 billion of Glencore's assets that could have seen the Israeli take control the company's mines in the country. Paying Gertler is the only way to keep hold of the assets, Glencore said in a statement Friday.

### i. The DRC Further Retaliates by Suspending Exports From Kamoto Mine

102.   On November 6, 2018, Katanga announced that the DRC government was immediately suspending all export and sale of copper ore from the Kamoto mine, citing the "presence of uranium … in levels that exceed the acceptable limit allowed for export…"

103.   Katanga further disclosed that it would be required to construct an Ion Exchange system to extract uranium residue from cobalt mined at the site, at an anticipated cost of approximated $25 million. It also announced that it expected the suspension to adversely affect its results of operations in the fourth quarter of 2018 and the first and second quarters of 2019.

104.   The market—recognizing that the suspension was a pretext for further retaliation against Katanga and Glencore by DRC officials—reacted swiftly and negatively. On news of the suspension, the price of Katanga's shares fell from a previous-day close of $0.49 to close at $0.38, a loss of approximately 22%, on unusually heavy volume.

### j. Katanga and Individual Defendants Agree to Pay Millions and Admit To Wrongdoing to Settle with the Ontario Securities Commission and Accept Sanctions

105.   In December 2018, the OSC publicly released the findings of its investigation. The OSC found that Katanga and the Individual Defendants "engaged in conduct… that undermined Katanga's corporate governance and internal controls and, which… resulted in Katanga making financial disclosure that was misleading in a material respect. This conduct breached Ontario securities law and was contrary to public interest."

30

106.    The OSC made detailed allegations of misconduct and fraud by Katanga and the Individual Defendants adversely affecting shareholders and in contravention of the public interest, including:

a.    Misleading disclosure relating to the results of Katanga's operations;

b.    Corporate governance deficiencies, and misleading compensation and reporting structure disclosure; and

c.    Internal control failures.

107.    The OSC also found that Katanga had issued incomplete, inadequate, and misleading risk disclosures during the Class Period, particularly with respect to its relationship with Glencore and with Dan Gertler, as discussed herein.

108.    On December 18, 2018, an OSC Panel approved a settlement with Katanga. As part of the settlement agreement between Katanga, certain individual respondents (including Individual Defendants in this action), and the OSC (the "Settlement Agreement"), Katanga agreed to pay CAD $28.5 million to the OSC, plus a further $1.5 million payment towards the costs of OSC Staff's investigation. They also agreed to pay for an independent consultant approved by OSC Staff to conduct a review of the policies, procedures, and effectiveness of Katanga's metals accounting.

109.    In the OSC Settlement, Defendants admitted (among other things) that they:

▪    Failed to maintain adequate disclosure controls and procedures and internal controls over financial reporting; and

▪    Failed to disclose material risks to its business, and in particular, the heightened risk of public sector corruption in the DRC and the extent of Katanga's reliance on individuals and entities associated with Israeli businessman Dan Gertler ("Gertler

Associates"), and the risk of an adverse impact of Katanga's business should its relationship with Gertler Associates deteriorate or cease.

110.    The Defendants Blizzard, Lubbe, Colwill, Henderson, Gallagher, and Mistakidis each admitted that they were complicit in Katanga's misstatements, and that those misstatements violated their disclosure obligations under Ontario's securities laws and the public interest.

111.    The individual respondents agreed to pay a total of CAD$5.9 million in administrative penalties, CAD$5.15 million of which was paid by Defendants in this case, as set forth below:

- ▪    Defendant Mistakidis paid CAD$2.45 million
- ▪    Defendant Gallagher paid CAD$950,000
- ▪    Defendant Lubbe paid CAD$550,000
- ▪    Defendant Henderson paid CAD$450,000
- ▪    Defendant Blizzard paid CAD$400,000
- ▪    Defendant Colwill paid CAD$350,000

112.    Each also agreed to pay CAD$50,000 in costs,

113.    The OSC also barred each of the Defendants from becoming or acting as an officer or director of a reporting issuer. Mistakidis and Lubbe were each barred for four years, Gallagher for six, Henderson for three, and Colwill and Blizzard for two.  Blizzard was required to resign as CEO of Katanga within 30 days, during which period he was to have no role in approving or certifying Katanga's 2018 annual financial statements and Management's Discussion & Analysis. As a direct result of the OSC probe, three of Katanga Mining's directors resigned, including Defendant Mistakidis, a senior executive at Glencore PLC.

114.    Following Katanga's admission of the charges laid out by the OSC and the Individual Defendants' acceptance of responsibility, together with monetary fines and suspension

from assuming any leadership role in a TSE-listed company, Katanga agreed to submit to extensive

auditing and review by an independent committee of its board of directors.

115.    Katanga appointed a new Chief Executive Officer and Chief Financial Officer and

replaced numerous members of its board—seats previously filled by Glencore-appointed

directors—with independent directors.

116.    In a December 18, 2018 news release announcing the Company's settlement with

the OSC, Katanga noted:

> Separately, the Company (and not its directors and officers) agrees in the settlement
> agreement that the Company failed to adequately describe the heightened risks
> associated with: (i) its operating environment, specifically the elevated risk of
> public sector corruption in the Democratic Republic of the Congo; and (ii) its
> reliance on individuals and entities associated with Dan Gertler, including the risk
> that a cessation or deterioration in Katanga's business relationships with such
> individuals and entities could have an adverse impact on Katanga's business.

117.    Katanga made no further elaboration and made no substantive disclosures as to the

nature of the "heightened risks" it admitted it had failed to disclose.

118.    Katanga's Chairman, Hugh Stoyell, stated that, ""

> This settlement enables the Company to continue to move forward with improved
> governance, compliance and control procedures and to focus on the completion of
> operational enhancements to its 75% owned copper and cobalt mine in the DRC
> with enhanced value for all our stakeholders. The Company takes full responsibility
> for failing to meet its disclosure obligations and to maintain effective internal
> controls as described in the settlement agreement. We believe the actions taken by
> Katanga's board of directors and management since the conclusion of the
> Company's internal review and restatement of certain financial statements in
> November 2017 have helped strengthen the Company."  Katanga also noted that it
> would "not be making any further statements on this matter."

### k.   Katanga Subsequently "Gifts" Over $1.6 Billion to Gécamines

119.    On March 1, 2019, Glencore admitted that Katanga Mining and KCC would be

"gifting" a debt write-off of $1.4 billion to Gécamines, in addition to the waiver of $285 million

of debts and costs—a total payoff exceeding $1.6 billion to keep control of Katanga's assets in the DRC.

120.     Glencore stated:

To ensure Gécamines' 25% interest was not diluted (contractually required), $*1.4 billion (25%) of the total debt converted to equity was effectively "gifted" by KML to Gécamines*…. In addition, it was agreed to… [p]ay Gécamines $150 million to settle various historical commercial disputes… [f]und, on behalf of Gécamines, $41 million of outstanding unpaid invoices for contractors in charge of an earlier replacement reserves program; and Waive KCC's right to $57 million of exploration and drilling expenditures incurred on behalf of Gécamines. *These amounts, totalling $248 million, have been expensed in the consolidated financial statements*.

Emphasis added.

121.     Thus, KML "gifted" additional shares in KCC worth approximately $1.4 billion to Gécamines, along with another $248 million in waived debt.

### l.     Katanga Announces a Rights Offering to Repay Debt to Glencore, Diluting Minority Shareholders and Consolidating Glencore's Control

122.     On November 7, 2019, Katanga announced that it would conduct a rights offering of shares valued at CAN $7.58 billion to repay its debt owed to Glencore, including for the above payoffs to the DRC and Gertler associates.

123.     The offering was structured to give Glencore the option to accept additional shares in repayment of approximately US$5.8 billion in debt, converting this debt to additional equity.

124.     Prior to the offering, Katanga has approximately 1.9 billion shares of common stock issued and outstanding. The rights offering raised the total number of outstanding Katanga shares to 61.2 billion – 59 billion of which were issued in the rights offering itself. Existing shareholders were diluted in a ratio of 31:1.

125.     Prior to the offering, Glencore was the beneficial owner of approximately 86.3% of Katanga's outstanding stock. After the offering, it now owns more than 99% of Katanga's outstanding equity. As beneficial owner of more than 90% of Katanga's shares, Glencore may now take Katanga private without approval of the remaining minority shareholders under Canadian law.

126.     On this news, the price of Katanga's shares fell again on extraordinarily heavy volume, from a closing price on November 6 of $0.27 to close on November 7 at $0.15, down 44.4%.

### KATANGA'S MATERIAL OMISSIONS AND MISREPRESENTATIONS OF FACT DURING THE CLASS PERIOD

127.     Ontario securities laws and regulations and the listing requirements of the TSX required Katanga to file[18] audited annual consolidated financial statements ("Annual Filings") and unaudited interim financial statements ("Interim Filings") for FY 2013, 2014, 2015, 2016, 2017 and 2018. Each of Katanga's Annual Filings for FY 2014, 2015, 2016, and 2017 was signed by Defendant Blizzard as CEO. Defendant Colwill signed Katanga's Annual Filings as CFO in FY 2014 and FY 2015. Defendant Lubbe signed as CFO for FY 2016. Each of Katanga's Annual Filings incorporated by reference Management's Discussion and Analysis ("MD&A") or the covered period, which was filed contemporaneously therewith, and which contained the materially misleading statements relating to Katanga's internal controls.

128.     Katanga must also file an Annual Information Form ("AIF"), which includes a discussion of risk factors and other material matters, and is incorporated by reference into the MD&A accompanying each of Katanga's Annual Filings during the Class Period.

---

[18] These filings are made available to investors and the general public through Canada's System for Electronic Document Analysis and Retreival ("SEDAR").

129.     Similar statements incorporating Katanga's AIFs by reference appear in its Annual Filings as follows: Annual Filings for FY 2014 (filed February 11, 2015), FY 2015 (filed February 11, 2016), FY 2016 (filed February 8, 2017), FY 2017 (filed March 31, 2018), and FY 2018 (filed April 1, 2019).

130.     In addition, Katanga's CEO and CFO certified Katanga's Annual Filings, including the incorporated MD&As and AIFs, during the Class Period which contained the materially misleading statements, stating that:

> The accompanying consolidated financial statements of Katanga Mining Limited ("Katanga" or the "Company") were prepared by management in accordance with International Financial Reporting Standards ("IFRS"). Management acknowledges responsibility for the preparation and presentation of the consolidated financial statements… Management has established a system of internal control over the financial reporting process, which is designed to provide reasonable assurance that relevant and reliable information is produced… Management recognizes its responsibility for conducting the Company's affairs in compliance with established financial standards, and applicable laws and regulations, and for maintaining proper standards of conduct for its activities.

Defendant Johnny Blizzard also signed Katanga's revised Code of Conduct, filed on March 30, 2016.

131.     As discussed herein, each of Katanga's Annual and Interim Filings and Codes of Conduct contained false, incomplete, and materially misleading statements and omissions concerning Katanga's financial reporting, internal controls, results of operations, and engagement in and policy regarding corrupt payments and bribery, including, specifically, each of the following:

- Katanga's Annual Filings, including all related Management's Discussion and Analysis ("MD&A") and Annual Information Forms ("AIFs), which were incorporated by reference therein, for the following periods:
  - FY 2014, filed February 11, 2015, and the incorporated:

- MD&A, filed February 11, 2015.
- AIF, filed March 31, 2015.
- FY 2015, filed February 11, 2016, and the incorporated:
  - MD&A, filed February 11, 2015.
  - AIF, filed March 30, 2016.
- FY 2016, filed February 8, 2017, and the incorporated:
  - MD&A, filed February 8, 2017.
  - AIF, filed March 31, 2017.
- FY 2017, filed April 2, 2018, and the incorporated:
  - MD&A, filed April 2, 2018.
  - AIF, filed April 2, 2018.
- FY 2018, filed February 20, 2019, and the incorporated:
  - MD&A, filed February 20, 2019.
  - AIF, filed April 1, 2019.

- Katanga's Interim Filings, filed on:
  - May 14, 2015, and the incorporated:
    - MD&A, filed May 14, 2015.
  - August 12, 2015, and the incorporated:
    - MD&A, filed August 12, 2015.
  - November 13, 2015, and the incorporated:
    - MD&A, filed November 13, 2015.
  - May 12, 2016, and the incorporated:
    - MD&A, filed May 12, 2016.
  - August 10, 2016, and the incorporated:
    - MD&A, filed August 10, 2016.
  - November 9, 2016, and the incorporated:
    - MD&A, filed November 9, 2016.
  - May 11, 2017, and the incorporated:
    - MD&A, filed May 12. 2017.
- Katanga's Codes of Conduct, filed on:

37

- April 17, 2015; and

- March 30, 2016.

The Company's false and misleading statements and omissions remained on the market, causing the price of Katanga's shares to be and remain artificially inflated until a series of corrective disclosures—discussed in Paragraphs 82-126, above—gradually revealed the truth to the market, resulting in a precipitous series of declines in the price of Katanga's securities, injuring the Company's investors.

### a. Katanga Admits Material Misrepresentations and Omissions in Reporting and Risk Disclosures Related to Dealings with Gertler

132.    On December 14, 2018, the OSC publicly released its Statement of Allegations announcing the findings of its investigation. The OSC found that Katanga and the Individual Defendants "engaged in conduct… that undermined Katanga's corporate governance and internal controls and, which… resulted in Katanga making financial disclosure that was misleading in a material respect. This conduct breached Ontario securities law and was contrary to public interest."

133.    On December 18, 2018, Katanga and the OSC jointly announced that they had reached a settlement agreement, under which Katanga and Individual Defendants Mistakidis, Gallagher, Henderson, Blizzard, Lubbe, and Colwill admitted to numerous material misrepresentations and omissions in their publicly-filed reports and disclosures during the Class Period, including:

a.   Misleading disclosure relating to the results of Katanga's operations;

b.   Corporate governance deficiencies, and misleading compensation and reporting structure disclosure; and

c.   Internal control failures.

134.    Katanga further admitted that it had issued misleading risk disclosures during the Class Period with respect to its relationship with Glencore and Gertler, specifically the nature and extent of its reliance on Gertler and his associates, including the risk that a cessation or deterioration in Katanga's business relationships with the Gertler Associates could have an adverse impact on Katanga's business. Katanga admitted that from 2013 until 2018, it paid the royalties and *pas de porte* previously due to Gécamines under the JV Agreement to a Gertler associate. Katanga was instructed by Gécamines to make the required royalty and *pas de porte* payments to Africa Horizons Investment Ltd. ("AHIL"), a Gertler-controlled company. In its contemporaneous AIFs, Katanga stated that the royalties and *pas de porte* were payable to Gécamines but did not disclose that they were actually paid to AHIL. Katanga did not disclose the payment of royalties and *pas de porte* to AHIL prior to 2017 and did not disclose the connection between AHIL and Gertler until 2018. During the Class Period, Katanga made royalty and *pas de porte* payments to AHIL totaling in excess of USD$146 million. During the Class Period, Katanga failed to disclose the material risks to its operations posed by its reliance on Gertler and his associated entities, or the nature and extent of its reliance upon Gertler and his associates to conduct its business in the DRC. As a result, Katanga's risk disclosures during the Class Period were incomplete and materially misleading.

135.    In addition, Individual Defendants Blizzard, Lubbe, Colwill, Henderson, Gallagher, and Mistakidis each admitted that they engaged in conduct that undermined Katanga's corporate governance, internal controls and culture of compliance. Blizzard, Lubbe, and Colwill were each responsible for verifying the accuracy of the Company's Annual and Interim Filings. Gallagher, Henderson, and Mistakidis, as directors, were each responsible for oversight of Katanga's senior management. All admitted that "each authorized, permitted or acquiesced in misleading statements

made by Katanga" in its Annual Filings and Interim Filings for FY 2014, FY 2015, and FY 2016. In addition, Blizzard, Lubbe, and Colwill certified Katanga's FY 2014 and FY 2015 Annual Filings and Defendants Blizzard and Lubbe certified Katanga's FY2016 Annual Filings, each of which were materially misleading when made.

### b. Katanga Failed to Recognize a Contingent Liability or Disclose a Potential Contingent Liability Related to Corruption Risk to DRC Assets

136.    Katanga's periodic filings were incomplete and misleading because they failed to disclose or recognize a contingent liability operations related to the bribes it paid to secure the mining concession or for the risk of loss of its DRC assets and continuity of DRC in the event that it ceased such corrupt payments as required by International Financial Reporting Standards ("IFRS").

137.    Katanga must issue annual and quarterly financial statements and reports and file those reports with Canadian securities authorities in a public database—the System for Electronic Document Analysis and Retrieval ("SEDAR")—to comply with listing requirements for Katanga's securities on the TSX. Katanga certifies in those reports that its annual and quarterly financial statements are prepared and issued in conformity with International Financial Reporting Standards ("IFRS").

138.    A contingent liability (or loss contingency) is "a possible obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more future uncertain events not wholly within the control of the entity." International Accounting Standards Board ("IASB"), International Accounting Standard ("IAS") 37.10, Provisions, Contingent Liabilities, and Contingent Assets, Definitions, IFRS Foundation, 2012.

139.    When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote.  IFRS uses the terms "probable" and "remote" to identify areas within that range, as follows:

a.  *Probable*. The future event or events are "more likely than not" to occur.

b.  *Remote*. The chance of the future event or events occurring is slight.

140.    "A contingent liability is disclosed… unless the possibility of an outflow of resources… is remote." IAS 37.28. "If it becomes probable that an outflow of future economic benefits will be required… a provision is recognized in the financial statements of the period in which the change of probability occurs (except in the extremely rare circumstances where no reliable estimate can be made). IAS 37.30. Examples of contingent liabilities include pending or threatened litigation, and actual or possible claims and assessments. Actual or possible claims and assessments include those imposed by governmental entities.

141.    Under IAS 37, Katanga was required to recognize a loss contingency for the probable loss of its DRC-based assets to government seizure or other adverse action as a result of its cessation of corrupt payments to DRC officials. An estimated loss from a loss contingency must be accrued by a charge to income on a company's financial statements if: 1) it is more likely than not (i.e. a 51% of higher likelihood) and 2) the amount of loss can be reasonably estimated.  IAS 37.28.

142.    Loss contingencies that do not meet both criteria for recognition (i.e., probable and estimable) still may need to be disclosed in the financial statements. "Unless the possibility of any outflow in settlement is remote, an entity shall disclose for each contingent liability at the end of the reporting period a brief description of the nature of the contingent liability, and where

practicable: (a) an estimate of the financial effect… (b) an indication of the uncertainties relating to the amount or timing of the outflow; and (c) the possibility of any reimbursement." IAS 37.86.

143.    IFRS 37 ¶86 requires the issuer to disclose a loss contingency in the notes to its financial statements so long as the chance of the loss contingency coming to pass is not "remote." Under 37 ¶86, Katanga was therefore required to disclose (a) an estimate of the dollar amount of the contingent liability, and (b) an indication of the uncertainties relating to the amount or timing of any outflow.

144.    The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, the disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

145.    In its annual and quarterly financial filings for FY 2014, 2015, 2016, 2017, and 2018, and interim periods therein, Katanga failed to recognize a contingent liability related to the real and material threat presented to its business and results of operations arising from political and corruption risk in the DRC, and Defendants' engaging Gertler and his associates to channel bribes and corrupt payments to DRC officials.

146.    Katanga knew but failed to disclose that it was dependent upon the continued disbursement of such corrupt payments to maintain access to these assets, and that in the event they ceased to pay such bribes, they would predictably face reprisals, up to and including the dissolution of their DRC operating subsidiary and total loss of access to the Kamoto mine and related assets and revenue streams. These losses were not remote and were reasonably estimable

within the meaning of IAS 37. Therefore, IFRS required Katanga to calculate and disclose a contingent liability.

147.     Defendants' failure to recognize and disclose a contingent liability in violation of IFRS rendered their financial statements and results of operations during the Class Period incomplete and materially misleading, including, specifically: Katanga's Annual Filings for FY 2014 (filed February 11, 2015), FY 2015 (filed February 11, 2016), FY 2016 (filed February 8, 2017), FY 2017 (filed April 2, 2018), and FY 2018 (filed February 20, 2019), its Interim Filings on May 14, 2015, August 12, 2015,  November 13, 2015 , May 12, 2016, August 10, 2016, November 9, 2016, May 11, 2017, and all related Management's Discussion and Analysis ("MD&A") and Annual Information Forms ("AIFs), which were incorporated by reference therein.

### c.   Katanga's Misstatements Related to Adequacy of Internal Control

148.     During the Class Period, Defendants claimed that Katanga maintained strong financial, operational, and compliance-related controls to ensure regulatory compliance and accuracy in its financial reporting.

149.     The February 11, 2016 Management's Discussion & Analysis accompanying Katanga's Annual Filings for FY 2015 and 2014, stated as follows:

> The CEO and CFO have concluded that, as at December 31, 2015, the Company's DC&P have been designed and operate effectively to provide reasonable assurance that (a) material information relating to the Company is made known to them by others, particularly during the period in which the annual filings are being prepared; and (b) information required to be disclosed by the Company in its annual filings, interim filings or other reports filed or submitted by the Company under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation. They have also concluded that the Company's ICFR have been designed and operate effectively to provide reasonable assurance regarding the reliability of the preparation and presentation of the consolidated financial statements for external purposes and were effective as at December 31, 2015.

150.     Similar representations, with immaterial differences, regarding the adequacy and effectiveness of Katanga's internal controls appear in its annual and quarterly financial statements as follows : Katanga's Annual Filings for FY 2014 (filed February 11, 2015), FY 2015 (filed February 11, 2016), and FY 2016 (filed February 8, 2017).

151.     On February 11, 2016, the Company filed its consolidated financial statements as at and for the years ended December 31, 2015 and 2014, which was signed by Defendants Blizzard and Colwill and stated the following regarding internal control over the financial reporting process:

> Management has established a system of internal control over the financial reporting process, which is designed to provide reasonable assurance that relevant and reliable information is produced.

152.     On February 8, 2017, the Company released its consolidated financial statements as at and for the years ended December 31, 2016 and 2015, which was signed by Defendants Blizzard and Colwill and stated the following regarding internal control over the financial reporting process:

> Management has established a system of internal control over the financial reporting process, which is designed to provide reasonable assurance that relevant and reliable information is produced.

153.     Further, Katanga stated in the MD&As accompanying its Annual Filings for FY 2014 (filed February 11, 2015), FY 2015 (filed February 11, 2016) that its CEO and CFO had concluded that "Katanga's internal controls had been designed effectively to provide reasonable assurance regarding the reliability of the preparation and presentation of the financial statements for external purposes and were effective[.]"

154.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's

business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company engaged in improper accounting practices, including mischaracterizing bribes to Gertler and Kabila as legitimate *pas de porte* payments, as described above; (2) there were material weaknesses in the Company's internal control over financial reporting, as described above; and (3) as a result, the Company's public statements were materially false and misleading at all relevant times. Contrary to their statements, as alleged above, despite knowing of high corruption risks in the DRC, Defendants violated Katanga's own policies and procedures, failed to conduct adequate due diligence, and ignored numerous red flags. In short, Katanga's internal controls were a sham. In addition, the weaknesses in the culture of compliance at Katanga rendered Katanga's internal controls ineffective during the Class Period, leading to the materially misleading statements discussed above. As such, Katanga failed to maintain adequate internal controls over financial reporting.

155.   These material weaknesses included:

Control environment material weaknesses – […] The Company has concluded that it did not adequately establish and enforce a strong culture of compliance and controls which includes the adherence to policies, procedures and controls necessary to present financial statements in accordance with IFRS;

Management override material weaknesses – The Company did not maintain effective controls to prevent or detect the circumvention or override of controls. Certain of the accounting adjustments identified in the Review are a result of senior management and executive directors in office at that time overriding the Company's control processes; and

Monitoring material weaknesses – […] The Company has determined that certain of the accounting adjustments identified in the Review were not identified earlier due to inadequate monitoring controls, including inadequate controls and procedures to properly quantify and verify the value of in-process concentrate inventories, inadequate controls with respect to quarter-end and year-end sales cut-off procedures, insufficient involvement of internal audit in the testing of the

accuracy of external financial reporting and inadequate procedures to ensure the effective implementation of internal audit recommendations on high risk areas, particularly with respect to metal accounting.

156.     Katanga thus admitted that its internal controls were deficient in that Katanga (1) "did not adequately establish and enforce a strong culture of compliance and controls"; (2) "did not maintain effective controls to prevent or detect the circumvention or override of controls, [and] certain… accounting adjustments … [were] a result of senior management and executive directors … overriding the Company's control processes"; and (3) maintained "inadequate monitoring controls… insufficient involvement of internal audit… and inadequate procedures to ensure the effective implementation of internal audit recommendations on high risk areas…".

### d.   Katanga's Failure to Disclose Dependence Upon Gertler and Associated Political and Regulatory Risks

157.     Katanga's FY 2014 AIF, dated March 31, 2015, stated, in relevant part, the following risk disclosures:

**Licenses, Permits and Governmental Regulations**

…*Katanga may also be subject to certain international bribery, government payment and anti-corruption laws*. … *Despite Katanga's efforts to comply with applicable requirements, there can be no assurance that the Corporation has been or will be at all times in complete compliance with such requirements, that compliance will not be challenged nor that the costs of complying with current and future requirements will not materially or adversely affect Katanga's future cash flow, results of operations and financial condition.*

\*        \*        \*

**LEGAL PROCEEDINGS AND REGULATORY PROCEEDINGS**

*There have been no penalties or sanctions imposed against the Corporation by a court relating to securities legislation or by a securities regulatory authority during the financial year ended December 31, 2015. No other penalties or sanctions have been imposed by a court or regulatory body against the*

> ***Corporation that would likely be considered important to a reasonable investor in making an investment decision.*** The Corporation has not entered into any settlement agreements with a court relating to securities legislation or with a securities regulatory authority.

Emphases added.

158.     Identical or substantially similar language appears in Katanga's AIFs for FY 2015, and FY 2016.

159.     The above statements were materially false and misleading in telling investors that Katanga was making and would continue to make "efforts to comply" with international corruption and bribery laws. In fact, Katanga made no efforts to comply with anti-bribery statutes because the foundation of its business was bribing Gertler and Kabila to obtain and maintain access to a mining concession in the DRC. Representing that it was making "efforts to comply" and warning only that there "can be no assurance" of compliance was incomplete and materially misleading absent disclosure that Katanga had in the past and was in the present paying bribes to and through Gertler to facilitate its principal operations in the DRC. These statement convey to investors the false impression that management was not aware of any such improper payments, instead suggesting caution regarding potential future unknowns, when in fact, Katanga's noncompliance with anti-corruption laws was a foregone conclusion, a fact of of which the Individual Defendants were entirely aware.

160.     Katanga's FY 2017 AIF, dated April 2, 2018, stated, in relevant part, the following incomplete and misleading risk disclosures:

**Anti-Bribery, Anti-Corruption and Economic Sanctions**
Katanga conducts business in jurisdictions where there is a risk of corruption in its interaction with state and non-state actors. Acts and payments that may be considered illegal under applicable Canadian and local criminal law and/or

extraterritorial anti-corruption, anti-bribery, anti-money laundering or export control regulations and related laws may be considered an acceptable or a common part of business culture in such jurisdictions. *The Corporation is committed to doing business in accordance with all applicable Canadian and local and extraterritorial anti-corruption laws and economic sanctions programs. Katanga currently has a Code of Conduct in place through which it seeks to maintain a strong culture of compliance and continuously seeks to re-evaluate and improve internal controls.*

Katanga may be subject to certain bribery, government payment and anti-corruption laws. Several of these statutes have been adopted within the past decade and their corresponding regulatory and enforcement regimes may continue to evolve and develop on an ongoing basis. These laws include, but are not limited to Canadian statutes such as the Corruption of Foreign Public Officials Act and the Extractive Sector Transparency Measures Act, as well as other international statutes such as the Bribery Act (UK), Foreign Corrupt Practices Act (USA) and Dodd-Frank Wall Street Reform and Consumer Protection Act (USA). *Despite Katanga's efforts to comply with applicable requirements, risks arise from Katanga's interaction with state and non-state actors in the DRC. The costs of complying with current and future requirements may materially or adversely affect Katanga's future cash flow, results of operations and financial condition.*

In December 2017 the United States government designated Mr. Dan Gertler and several of his affiliated companies as Specially Designated Nationals ("**SDNs**") by way of Executive Order 13818 (the "Order")… *the Corporation has pre-existing contractual obligations in DRC to make certain payments to Africa Horizons Investment Limited ("AHIL"), a company also designated as an SDN and owned by Mr. Gertler, which obligations pre-date AHIL's designation as an SDN and which arose when AHIL acquired such rights from Gécamines. The Corporation has not made any payment to AHIL or other entities owned by Mr. Gertler since he and a number of his companies were designated as SDNs and is still considering how best to mitigate its risks in relation to these obligations.*

### Joint Venture Partners
Katanga's subsidiaries have partnered with Gécamines to implement the JV Agreement. Katanga is subject to the risks normally associated with the conduct of joint ventures. These risks include disagreement with a joint venture partner on how to develop, operate and finance a project; compliance by the joint venture partners with the operating requirements in the joint venture agreements; and possible litigation between the joint venture partners regarding joint venture matters. These matters may result in material legal liability or may have an adverse effect on Katanga's cash flow, earnings, results of operations and financial condition.

To date, despite the fact that KCC is facing a capital deficiency that should have been rectified by December 31, 2017, the negotiations between joint-venture

partners have not made meaningful progress … ***The chairman of Gécamines has communicated on several occasions his intention to unilaterally renegotiate the terms of the partnerships of the DRC state owned company, including the JV Agreement. The chairman of Gécamines claimed that the negotiations are expected to commence when the audit of KCC by the external auditor is finalised. The JV Agreement does not provide for a unilateral modification of its terms. Until the results of the external audit and the points of negotiation raised by Gécamines are known, if any, the Corporation cannot ascertain the impact, material or otherwise, of these developments on its business.***

**Litigation Risks**

…Katanga may also be subject to certain international bribery, government payment and anti-corruption laws. … ***Despite Katanga's efforts to comply with applicable requirements, there can be no assurance that the Corporation has been or will be at all times in complete compliance with such requirements***, that compliance will not be challenged nor that the costs of complying with current and future requirements will not materially or adversely affect Katanga's future cash flow, results of operations and financial condition.

Emphases added.

161.    The above statements were materially false and misleading in telling investors that Katanga was making and would continue to make "efforts to comply" with international corruption and bribery laws. In fact, Katanga made no efforts to comply with anti-bribery statutes because the foundation of its business was bribing Gertler and Kabila to obtain and maintain access to a mining concession in the DRC. They further misled investors by failing to disclose the business risks presented by operating its business in the DRC, where the current and future viability of its business depended entirely upon past and present payment of bribes and corrupt payments, that the continuation of such corrupt payments would be necessary to secure its business interests and assets in the DRC for the foreseeable future, and that the cessation of such corrupt payments could be expected to lead to adverse actions by the DRC and DRC-related entities and the loss or substantial impairment of its DRC assets and operations. These statements further misled investors by minimizing and failing to disclose the known and knowable risk that cessation of payment to

and through Gertler would result in retaliatory actions by Gertler, Gécamines, and the organs of the DRC government.

162.    Katanga's FY 2018 AIF, dated April 1, 2019, contained, in relevant part, the following risk disclosures:

> **Anti-Bribery, Anti-Corruption and Economic Sanctions**
> Katanga conducts business in jurisdictions where there is an elevated risk of corruption in its interaction with state and non-state actors. Acts and payments that may be considered illegal under applicable Canadian and local criminal law and/or extraterritorial anti-corruption, anti-bribery, anti-money laundering or export control regulations and related laws may be considered an acceptable or a common part of business culture in such jurisdictions. ***The Company is committed to doing business in accordance with all applicable Canadian and local and extraterritorial anti-corruption laws and economic sanctions programs.*** Katanga currently has a Code of Conduct in place through which it seeks to maintain a strong culture of compliance and continuously seeks to re-evaluate and improve internal controls.
>
> \*        \*        \*
>
> ***Despite Katanga's efforts to comply with applicable requirements, risks arise from Katanga's interaction with state and non-state actors in the DRC. The costs of complying with current and future requirements may materially or adversely affect Katanga's future cash flow, results of operations and financial condition.***
>
> In December 2017 the United States government designated Mr. Dan Gertler and several of his affiliated companies as SDNs by way of Executive Order 13818 (the "Order"). … As described under the heading "*Material Contracts – JV Agreement*", ***the Company has pre-existing contractual obligations in DRC to make certain payments to AHIL, a company also designated as an SDN and owned by Mr. Gertler***, which obligations pre-date AHIL's designation as an SDN and which arose when AHIL acquired such rights from Gécamines. AHIL assigned its right to receive royalties to Ventora.
>
> ***Based on its review, Katanga determined that in the circumstances the only viable option, for its sole operation, KCC, to avoid the material risk of seizure of its assets under DRC court orders was for KCC to pay the relevant royalties as and when they become due to Ventora in non-US dollars, without involving US persons, in order to discharge its obligations while mitigating its risk in connection with the SDN designation.***
>
> \*        \*        \*

50

**Regulatory and Corporate Law Risks**
*Ontario Securities Commission Matters*
On December 18, 2018, Katanga announced that the OSC approved a global settlement agreement (the "OSC Settlement Agreement") between staff of the OSC and the Company, certain of its former directors and officers and its Chief Executive Officer relating to the investigation by staff into certain of the Company's historical disclosures.

Pursuant to the OSC Settlement Agreement, the Company agreed to certain obligations and remedial measures on an ongoing basis that require engagement with Staff of the OSC going forward. ***Though the Company believes that the OSC Settlement Agreement satisfied the OSC's material concerns arising from their 2017-2018 investigation of the Company, there is a risk that the failure by the Company to satisfy its ongoing obligations or to complete the continuing OSC compliance requirements may result in further regulatory involvement by the OSC, which may have an adverse effect on the Company's business.***

Emphases added.

163.    The above information was materially false and misleading because it communicated to investors that Katanga was making and would continue to make "efforts to comply" with international corruption and bribery laws. In fact, Katanga made no efforts to comply with anti-bribery statutes because the foundation of its business was bribing Gertler and Kabila to obtain and maintain access to a mining concession in the DRC. It further misled investors by failing to disclose the business risks presented by operating its business in the DRC, where the current and future viability of its business depended entirely upon past and present payment of bribes and corrupt payments, that the continuation of such corrupt payments would be necessary to secure its business interests and assets in the DRC for the foreseeable future, and that the cessation of such corrupt payments could be expected to lead to adverse actions by the DRC and DRC-related entities and the loss or substantial impairment of its DRC assets and operations. These statements further misled investors by minimizing and failing to disclose the known and knowable risk that

cessation of payment to and through Gertler would result in retaliatory actions by Gertler, Gécamines, and the organs of the DRC government.

### e. Katanga's Incomplete and Materially Misleading Statements Concealed Diversion of Royalties and *Pas de Porte* from Gécamines to Gertler-Controlled Entity Africa Horizons Investments Limited ("AHIL")

164.    As discussed in the foregoing, Katanga and Glencore entered into a series of transactions involving the issuance of loans and debt facilities, debt participation, stock options, and similar financial instruments by and between (a) Glencore, Katanga, and other Glencore-controlled business entities, and (b) Gertler and his associates and associated business entities which facilitated and operated to disguise and conceal corrupt payments to Gertler and his associates and through Gertler and his associates to DRC officials, including Kabila and Mwanke.

165.    In its FY 2014 AIF, Katanga included the following discussion regarding payments to Gécamines  under the JV Agreement:

> **JV Arrangement**. Katanga indirectly owns 75% of KCC. Gécamines, a DRC state owned entity … owns the remaining 25% interest in KCC. … . *KCC is required to pay a royalty equivalent to 2.5% of net revenues of the project, for the use of its equipment and facilities, and the depletion of the deposits. A "pas de porte" ("entry premium") equal to an aggregate of $140 million is payable by KFL Limited ("KFL") and Global Enterprises Corporate Limited ("GEC") (both KFL and GEC are subsidiaries of the Corporation) for the access to the Concession Area payable in installments on an agreed schedule until 2016.*

Emphasis added.

166.    The above statement is misleadingly incomplete in representing that Katanga obligated to pay royalties and *pas de porte* to *Gécamines*. In fact, it was directing these payments to Africa Horizons Investments Limited ("AHIL"), a Gertler-controlled entity, which had and would continue to use the funds to make corrupt payments to DRC officials.

167.    Katanga's FY 2015 and FY 2016 AIFs contained substantially identical discussions regarding the JV Agreement, which were incomplete and misleading for the same reasons stated in the foregoing.

168.    In its FY 2017 AIF—which was issued on March 31, 2018—Katanga finally disclosed that these payments ostensibly payable to Gécamines were, in fact, being paid to AHIL:

**Anti-Bribery, Anti-Corruption and Economic Sanctions**

In December 2017 the United States government designated Mr. Dan Gertler and several of his affiliated companies as Specially Designated Nationals ("SDNs") by way of Executive Order 13818 (the "Order").… non-U.S. persons who are determined by the U.S. government to "have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" a party designated under this Order could themselves be designated as an SDN. *As described under the heading "Material Contracts – JV Agreement", the Corporation has pre-existing contractual obligations in DRC to make certain payments to Africa Horizons Investment Limited ("AHIL"), a company also designated as an SDN and owned by Mr. Gertler, which obligations pre-date AHIL's designation as an SDN and which arose when AHIL acquired such rights from Gécamines. The Corporation has not made any payment to AHIL or other entities owned by Mr. Gertler since he and a number of his companies were designated as SDNs and is still considering how best to mitigate its risks in relation to these obligations.*

\*          \*          \*

*JV Agreement.* … *In 2014, Gécamines directed KFL to pay the last three installments of the entry premium to AHIL. One installment was paid to AHIL in 2014 and two installments were prepaid to AHIL in 2015, for a total discounted value of $43.5 million, after taking time value of money into consideration.* … *Pursuant to the JV Agreement, KCC is also required to pay a royalty equivalent to 2.5% of net revenues of the project, for the use of Gécamines' equipment and facilities and the depletion of the deposits. Initially, pursuant to the JV Agreement, the royalty was payable directly to Gécamines. Following the acquisition of rights from Gécamines by companies affiliated to Mr. Gertler, Gécamines directed KCC to make payment of the royalty to AHIL.* The direction to pay the royalty to AHIL in lieu of Gécamines was formalized on January 22, 2015 pursuant to a tripartite royalty agreement between Gécamines, AHIL and KCC… *In March and July 2015 respectively, AHIL and KCC entered into two prepayment agreements pursuant to which KCC made advance payments of royalties to AHIL for a total discounted value of $54.7 million*, … *In December*

*2017, the United States government designated Mr. Gertler and affiliated companies as SDNs. See "Risk Factors - Jurisdictional Risk" for additional information. The Corporation has not made any payment to AHIL or other entities owned by Mr. Gertler since he and a number of his companies were designated as SDNs and is still considering how best to mitigate its risks in relation to these obligations.*

Emphases added.

169.     These statements were themselves misleadingly incomplete because they failed to disclose that payments to Gertler were being utilized to finance bribery and corrupt payments in the DRC. Further, Katanga represented that it had "not made any payment…since [Gertler] and a number of his companies were designated SDNs and is still considering how best to mitigate its risks in relation to these obligations…", which was itself incomplete and misleading in that it implied, and a reasonably prudent investor could have taken it to mean, that the "risks in relation to these obligations" were restricted to regulatory risks, or the risk of penalties being imposed by the U.S. government , including but not limited to designation as an S.D.N. In fact, Defendants knew or should have known that their cessation of royalty payments to Gertler—and through them, bribes and corrupt payment to Kabila and Mwanke—presented a highly probably risk of loss of Katanga's business interests and holdings in the DRC when Gertler and the DRC government took retaliatory action.

### f.     Katanga's False and Materially Misleading Statements Regarding Compliance with Anti-Corruption Laws and Political Corruption in Katanga's Codes of Ethics

170.     Katanga maintained an official Code of Conduct, which it made available to the public and filed through SEDAR. In that Code of Conduct—which Katanga revised and updated at regular intervals—the Company made false and materially misleading statements regarding its commitment not to engage in bribery or other improper payments in the conduct of its business.

171.   Katanga's Code of Conduct, filed on April 17, 2015,  states in relevant part:

***You must, in all of your business dealings, comply with applicable anti-corruption laws, the Code and the KML Anti-Corruption Policy, which sets out our rules on the prevention of bribery***. …

Bribery is a criminal act in most countries and the penalties are severe for both KML and our Employees. Even appearing to break these laws can have a serious impact on KML's reputation….

***You should never solicit, accept, offer, provide or authorise bribes of any kind or anything which may be construed as a bribe either directly or indirectly or otherwise through any third party***..

A public official may offer to enable or speed up a process that is his or her duty to perform, in return for a small payment. ***Such payments are often called facilitation payments and should not be made***. …

***You must seek to ensure that any business partners and Associated Persons working with KML will not breach anti-corruption laws or the KML Anti-Corruption Policy when acting on our behalf.***

***You must make appropriate enquiries when engaging a business partner*** or Associated Person in accordance with relevant KML policies and procedures. These will vary with the specifics of location and operation but should include confirmation that:
• ***The individual or company is reputable***, competent and qualified;
• The requested compensation is reasonable; and
• The ***proposed engagement complies with all applicable laws***.

\*        \*        \*

***Sanctions are laws, regulations and compulsory measures enacted by governmental authorities in relation to particular states, regimes, entities and individuals***. Such laws, regulations and measures may directly or indirectly restrict transactions involving goods, services, payments and capital transfers, or the movement of persons. ***They may also include other prohibitions, licensing and reporting obligations. You must respect and uphold any applicable sanctions***.

Emphases added.

172.   Katanga's revised Code of Conduct,  filed on March 30, 2016, states:

… ***You must not solicit, accept, offer, provide or authorise any bribe either directly or indirectly or through any third party***. Any concerns about potential bribery must be reported…

A public official may offer to enable or speed up a process that is his or her duty to perform, in return for a small payment. ***Such payments are often called facilitation payments and should not be made***.

*       *       *

***All dealings with public officials must be transparent and we must guard against circumstances where even the appearance is made of inducing a public official to perform his or her work improperly***. Further guidance on this matter can be obtained from the ***global anti-corruption policy*** or an appropriate compliance contact.

*       *       *

***KML seeks to ensure that any business partners and Associated Persons working with us will not breach anti-corruption laws or the KML Anti-Corruption Policy when acting on our behalf.***

***KML makes appropriate enquiries when engaging a business partner or Associated Person in accordance with relevant KML policies and procedures***. These will vary with the specifics of location and operation but should include confirmation that:

- ***The individual or company is reputable***, competent and qualified;
- The requested compensation is reasonable; and
- The ***proposed engagement complies with all applicable laws***.

*       *       *

Sanctions are laws, regulations and compulsory measures enacted by governmental authorities in relation to particular states, regimes, entities and individuals. Such laws, regulations and measures may directly or indirectly restrict transactions involving goods, services, payments and capital transfers, or the movement of persons. They may also include other prohibitions, licensing and reporting obligations*. **You must respect and uphold any applicable sanctions***.

173.    These statements were false and misleading when made, because at the time it was

made, Katanga, Glencore, and the Individual Defendants were then actually engaged in a scheme

to direct bribes through Dan Gertler and related entities to Joseph Kabila and affiliated entities in

the DRC. Katanga did not, in fact, "seek to ensure that any business partners… will not breach

anti-corruption laws… when acting on [its] behalf" and did not "make appropriate enquiries when engaging a business partner" in relation to its retention of Gertler and funding through Gertler of corrupt payments and bribes to Congolese officials. Katanga did not, in fact, "respect and uphold…applicable sanctions" by continuing to make corrupt payments through Gertler after Global Magnitsky Act sanctions were imposed upon him, including by resuming such payments in non-U.S. currency in or around June 15, 2018. Defendants engaged in business dealings with Gertler and his related entities in knowing and willful violation of U.S.-imposed sanctions, in direct contradiction to the policy stated in Katanga's Code of Conduct.

## ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### *DRC Mining Was the Core Operation of Katanga's Business*

174.    The DRC was such an important and integral part of Katanga's operations that it would be absurd to suggest that Defendants were unaware of the bribes that Katanga made.

175.    Katanga claims to have the "potential of becoming Africa's largest copper producer and the world's largest cobalt producer." Cobalt is used the high-capacity batteries that power all electric cars and cell phones. Cobalt is considered a critical raw material and technology enabler, where its used in gas turbines, high temperature alloys, industrial catalysts and energy storage. Cobalt is a key ingredient in the battery chemistry expected to help transition to a low-carbon economy. Cobalt is only found in economically exploitable quantities in just a few countries, including those in Central Africa. Around 49% of the world's reserves are found in the DRC which is also responsible for close to 60% of annual mine supply. Given its broad range of applications, cobalt is expected to experience good demand growth in its traditional markets going forward whilst battery sector demand is likely to rise at double-digit rates, leading to strong and sustained consumption growth.

176.    Copper production and assets, including cobalt, accounted to substantially all of Katanga's revenue during the Class Period. Accordingly, the mines in the DRC represented an integral part of Glencore's current and future operations due to the high demand of cobalt.

### FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

177.    Plaintiffs are entitled to rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on the OTC Markets, a highly efficient and automated market;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

(h)    Plaintiffs and members of the Class purchased, acquired and/or sold Katanga securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

178.    At all relevant times, the market for Katanga securities was an efficient market for the following reasons, among others:

(a)     As a regulated issuer, Katanga filed periodic public reports with the OSC through SEDAR, which are presented in U.S. dollars and in English, and are freely available in electronic format to the public in the U.S. and elsewhere;

(b)     Katanga securities met the requirements for listing, and were listed and actively traded on the Toronto Stock Exchange ("TSX") the U.S. OTC Markets[19], which together and separately operate as highly efficient markets;

(c)     During the Class Period, the average weekly trading volume for Katanga stock was 506,583 shares on the OTC market and 3,213,826 on the TSX, for a total average daily volume of 3,720,409, which represents 1.63% of the weekly average float of 227,903,959 shares during the Class Period;

(d)     Katanga regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures;

(e)     There were at least 122 news articles about Katanga published during the Class Period;

(f)     Katanga's results were included in the consolidated results of operations of Glencore, which was followed by more than 20 securities analysts employed by major brokerage firms[20] who wrote reports which were distributed to those brokerage firms' sales force and which were publicly available and entered the public marketplace;

(g)     Glencore, through Defendant Glasenberg and others, regularly commented upon Katanga's results of operations and other topics related to its business, including

---

[19] Plaintiffs do not assert claims on behalf of purchasers of Katanga's shares on the TSX. Plaintiffs maintain that trading activity in Katanga's shares on the TSX and related press and analyst coverage is relevant to the efficiency of the market for Katanga's shares overall. Katanga's shares are freely transferrable on and between both markets and their price ordinarily tracks within +/- 1%, accounting for applicable exchange rates.

[20] Firms with equity analysts covering Katanga through Glencore include Bank of America Merrill Lynch, Barclays Capital, Bernstein, BMO Capital Markets, Citigroup, Clarkson Platou Securities, Exane BNP Paribas, Goldman Sachs, HSBC, Investec, Jeffries & Co., JP Morgan Cazenove, Liberum Capital, Macquarie, Morgan Stanley, RBC Capital Markets, Redburn, Renaissance Capital, Société Générale, Standard Bank, and UBS.

through regular press releases, communications with the financial press, and colloquy with securities analysts and other stakeholders in quarterly earnings calls;

(h) More than 20 brokerage firms made a market in Katanga's stock in the U.S., including Citibank, Costar Technologies, Virtu Financial, and INTL FCStone;

(i) During the Class Period, Katanga's stock quickly reacted to unexpected material Company-specific news with its share price rising and falling in the expected direction in response to such news, an important and persuasive indication of market efficiency;

(j) Below is a chart detailing the dates of Company-specific news being released and Katanga's share price direction to the news, including the percentage change and direction of the share price reaction:

| Date | Company-Specific News | Change in Value of Katanga Shares |
|------|----------------------|-----------------------------------|
| October 27, 2017 | Katanga provides a "Status Update" disclosing it is subject to a Management Cease Trade Order ("MCTO"). | -11.5%, volume rose 107% from previous day. |
| February 1, 2018 | Katanga releases disappointing annual results. | -13.9%, volume rose 85% from previous day. |
| February 21, 2018 | Glencore releases positive FY 2017 preliminary financial results, touting ramp-up of Katanga's operations and Whole Ore Leech Plant project. | +20.1%, volume rose 204% from previous day. |
| April 2, 2018 | Katanga releases Q4 and FY 2017 results showing rapidly increasing losses. | -8.3%, volume rose 172% from previous day.. |
| November 16, 2018 | Katanga announces lifting of customs restrictions and resumption of exports | +19.4%, higher than average volume. |
| December 3, 2018 | Katanga announces commissioning of Phase 2 of Whole Ore Leach Plant | +23.7%, volume rose 581% from previous day. |
| August 7, 2019 | Katanga announces 2Q 2019 results showing reduced sales and revenue from copper and mounting losses. | -9.7%, volume rose 624% from previous day. |

179.    As shown above, the market for Katanga's securities promptly digested current information regarding Katanga from all publicly available sources and reflected such information in Katanga securities. This is the hallmark of an efficient market.

180.    Under these circumstances, all purchasers and acquirers of Katanga securities during the Class Period suffered similar injury through their purchases or acquisitions of Katanga securities at artificially inflated prices, and the presumption of reliance applies.

181.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

182.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

183.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

184.    Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

185.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Katanga who knew that those statements were false when made.

186.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, even if they were identified as "forward-looking statements," which they were not, at the time each "forward-looking statement" was made the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Katanga who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

187.   Plaintiffs bring this action as a class under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Katanga on or through U.S. OTC Markets during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

188.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

189.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

190.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

191.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading public filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading public filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

192.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against Defendants Katanga, Blizzard, Colwill, and Lubbe

193.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

194.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

195.     During the Class Period, Defendants named in this count  individually and in concert, directly or indirectly, disseminated or approved the false statements specified above,

which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

196.    Defendants named in this count violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

197.    Defendants named in this count acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

198.    Individual Defendants named in this count, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to

ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

199.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the statements of Defendants named in this count, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the false and misleading statements of Defendants named in this count.

200.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the statements of Defendants named in this count and by the material adverse information which Defendants named in this count did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

201.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

202.    By reason of the foregoing, Defendants named in this count have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against Defendant Glencore and the Individual Defendants**

203.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

204.    During the Class Period, Glencore and the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions or, in the case of Glencore, control, they knew the adverse non-public information regarding the Company's business practices.

205.    As officers and/or directors or controlling shareholder of a publicly owned company, the Individual Defendants and Glencore had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

206.    Because of their positions of control and authority as senior officers and controlling shareholders, the Individual Defendants and Glencore were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants and Glencore exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants and Glencore, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

207.    Each of the Individual Defendants and Glencore, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors  or

controlling shareholders of the Company, each of the Individual Defendants and Glencore had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants and Glencore exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

208.   By reason of the above conduct, the Individual Defendants and Glencore are liable under Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 22, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the Putative Class*

Brent J. LaPointe (*pro hac vice*)
275 Madison Avenue, 34th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: blapointe@rosenlegal.com

*Counsel for Plaintiffs and the Putative Class*